**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

**MANHATTAN COURTHOUSE**

| | |
|---|---|
| Monique Labarr, individually and on behalf of all others similarly situated, | 1:23-cv-01135 |
| Plaintiff, | |
| - against - | Class Action Complaint |
| The Epoch Times Association Inc., | Jury Trial Demanded |
| Defendant | |

Plaintiff alleges upon information and belief, except for allegations about Plaintiff, which are based on personal knowledge:

1. The Epoch Times Association Inc. ("Defendant") markets and sells subscriptions to the digital version of its news publication, The Epoch Times ("Subscription" or "Service").

## I. SUBSCRIPTION ECONOMY

2. Recurring electronic transactions in exchange for content, products or services defines the "subscription economy."

3. Subscription services have grown over four hundred percent in the past ten years and will reach to $1.5 trillion by 2025.

4. Companies value subscriptions because they provide consistent revenue, granular customer data useful for marketing and are considered "sticky" by "locking in" customers.

5. Consumers value subscriptions for reasons including minimizing friction of routine transactions.

6. The subscription economy is based on negative option marketing, where the customer's silence, or non-rejection of goods or services, constitutes acceptance.

7. This term comes from the fact that to cancel a subscription, the customer must

exercise a "negative option" to affirmatively opt-out of future transactions.

8.      The Federal Trade Commission ("FTC") identified four types of negative options.

9.      In a continuity plan, consumers agree in advance to receive periodic shipments of goods or provision of services and incur charges until they take steps to cancel the arrangement.

10.     An automatic renewal plan involves the automatic renewal of the initial contract terms at the end of a fixed period unless consumers instruct otherwise.

11.     The other types include free-to-pay and nominal fee-to-pay conversion plans.

12.     These involve customers receiving a good or service for a free or nominal price for an introductory period.

13.     However, if the customer does not affirmatively cancel, they will be charged a significantly higher amount for the product or service.

14.     A 2018 report from the Better Business Bureau ("BBB") based on FTC data showed that consumers have lost over $1.3 billion in "free/nominal-fee trial offer" plans over the last ten years.

15.     From 2015 through 2017, the BBB received 36,986 complaints about free/nominal-fee trials.

## II.    MISLEADING SUBSCRIPTION PRACTICES

16.     Defendant's introductory subscription offers let customers purchase two months for $1 or twelve months for $99.

17.     After the initial period has passed, subscribers are subject to autorenewal on a monthly or yearly basis, at a cost of $9.99/month or $99.00/year.

18.     This autorenewal is in contrast to subscription services designed to let customers "opt-in" to renewing after an initial term or at other points in their usage.

19.    Defendant's default autorenewal takes advantage of consumer inertia, as psychological studies have shown autorenewal users are seven times more likely to "continue" or not cancel their subscriptions, compared to if a subscription service was set to automatically cancel ("autocancel").

20.    Researchers have labeled this phenomenon as "status quo bias," making consumers susceptible to "sludge," so that they are unlikely to depart from a default option, even where it would be in their interest to do so.

21.    For example, study participants self-estimated there was an 80% chance they would complete a mail-in form to receive a refund, even though the final submission rate was only 30%.

22.    These studies show that consumers tend to procrastinate on mundane tasks, especially where they are deemed boring or difficult, which includes cancelling subscriptions.

III.    CANCELLATION OBSTACLES

23.    Defendant has a scientifically designed process to reduce "churn," an industry term for customer cancellation rates.

24.    These mechanisms have been developed and tested by experts in behavioral science and psychology and include interrelated manipulative design tactics referred to as "dark patterns."

25.    The result is that Defendant can scientifically ensure that no more than a fixed percentage of users will successfully navigate the gauntlet of obstacles laid down in front of them if they decide to cancel.

26.    These methods were successful in preventing Plaintiff from cancelling and resulted in her having to cancel her credit card to avoid being charged an autorenewal fee.

A.    No Obvious or Apparent Cancellation Method

27.    Upon learning that her subscription was being auto-renewed, Plaintiff went to the

service's website to cancel and prevent any charges to her payment method.

28.    However, Defendant utilized sophisticated and manipulative design and interface practices, known as "dark patterns," to stymie Plaintiff's attempts.

29.    This included a link labeled "Manage My Subscription" which pulled up a video and several promotional offers to entice Plaintiff and other subscribers to keep their Service.

30.    Only after watching the video for more than one minute was Plaintiff able to click through and decline the promotional offers.

31.    Once she did so, she was provided the option to cancel by calling Defendant's customer service number or using the LIVE CHAT function.

32.    However, Plaintiff could not adequately navigate and complete the process, so she was left to cancel her credit card to prevent Defendant from charging her payment method for the unwanted autorenewal.

B.  Inability to Process Natural Language Requests for Cancellation

33.    Like many companies seeking to minimize costs for customer service, Defendant uses "artificial intelligence" ("AI") chatbots with names that appear to correspond to human beings.

34.    However, these AI responders are designed to be unable to process anything other than the most basic and simple requests, often repeating boilerplate chunks of text, only some of which may be responsive to a customer.

35.    In practice, the AI responders are not equipped to adequately respond to customer requests with keywords such as "cancel" and "refund."

36.    Upon information and belief, support requests containing these and other keywords are placed in lower priority queues.

37.    The purpose is to cause customers to "give up" out of frustration and eventually cease their attempts at cancellation.

38.    Even when actual persons override the AI responders, they are intentionally not provided the training and ability to address issues relating to cancellation.

39.    Defendant's responses are intentionally designed to frustrate customers like Plaintiff.

## IV.    CONCLUSION

40.    Defendant makes other representations and omissions with respect to its subscription practices which are false and misleading.

41.    Plaintiff paid more for the Service than she would have paid had she known the above-referenced facts, and would not have purchased it or would have paid less.

42.    As a result of the false and misleading representations, the Subscription is sold at a premium price, approximately no less than $9.99 per month and $99.00 per year, in addition to the introductory costs, excluding tax and sales, and higher than it would be sold for absent the misleading representations and omissions.

Jurisdiction and Venue

43.    Jurisdiction is based on the Class Action Fairness Act of 2005 ("CAFA"). 28 U.S.C. § 1332(d)(2).

44.    The aggregate amount in controversy exceeds $5 million, including any statutory and punitive damages, exclusive of interest and costs.

45.    Plaintiff is a citizen of California.

46.    Defendant is a New Jersey non-profit corporation with a principal place of business in New York.

47.    The class of persons Plaintiff seeks to represent includes persons who are citizens of

5

different states from which Defendant is a citizen.

48.    The members of the class Plaintiff seeks to represent are more than 100, because the number of The Epoch Times digital subscribers are in the thousands in the States covered by Plaintiff's proposed classes.

49.    Venue is in this District with assignment to the Manhattan Courthouse because Defendant's principal place of business is in New York County, which is where the decisions and policies with respect to The Epoch Times digital subscription were made, and where Plaintiff's payment information was physically received by Defendant, at its servers located in its main office.

## Parties

50.    Plaintiff Monique Labarr is a citizen of Yorba Linda, Orange County, California.

51.    Defendant The Epoch Times Association Inc. is a New Jersey non-profit corporation with a principal place of business in New York, New York County, New York.

52.    Defendant's digital subscription service has tens of thousands of users.

53.    Plaintiff subscribed to the Service at or exceeding the above-referenced price.

54.    Plaintiff would not have subscribed to the Service or would have paid less if she knew she would not be able to unsubscribe, cancel her subscription, and not be charged further without having to initiate a credit card dispute and/or cancel her credit card.

## Class Allegations

55.    Plaintiff seeks certification under Fed. R. Civ. P. 23 of the following classes:

> **California Class:** All persons in the State of California who subscribed to the Subscription during the statutes of limitations for each cause of action alleged; and

> **Consumer Fraud Multi-State Class**: All persons in the States of Arizona, Delaware, Nevada, New Hampshire, Alabama, Alaska, Utah, Mississippi,

Kansas, North Dakota, West Virginia, and Louisiana who subscribed to the Subscription during the statutes of limitations for each cause of action alleged.

56.    Common questions of issues, law, and fact predominate and include whether Defendant's representations were and are misleading and if Plaintiff and class members are entitled to damages.

57.    Plaintiff's claims and basis for relief are typical to other members because all were subjected to the same unfair, misleading, and deceptive representations, omissions, and actions.

58.    Plaintiff is an adequate representative because her interests do not conflict with other members.

59.    No individual inquiry is necessary since the focus is only on Defendant's practices and the class is definable and ascertainable.

60.    Individual actions would risk inconsistent results, be repetitive and are impractical to justify, as the claims are modest relative to the scope of the harm.

61.    Plaintiff's counsel is competent and experienced in complex class action litigation and intends to protect class members' interests adequately and fairly.

Violation of Unfair Competition Law ("UCL"),
Cal. Bus. & Prof. Code §§ 17200 *et seq.*[1]

62.    Plaintiff incorporates by reference all preceding paragraphs.

63.    Defendant's conduct constitutes an unfair business act and practice because it signs customers up for an introductory period/trial and enrolls them in a subscription without their knowledge.

64.    Defendant falsely reassures customers it can easily cancel when they cannot.

---

[1] The California statutory claims are asserted on behalf of the California Class.

65.     Defendant's conduct was and continues to be unfair and fraudulent because it made materially false representations to customers who were signing up only for an introductory period/trial, which would conclude without them being charged more than the $1 for two months or $99 for twelve months.

66.     Defendant's misrepresentations constitute an "unlawful" practice because they violate relevant laws, regulations and common law.

67.     Plaintiff signed up to receive digital access to The Epoch Times because it was only $1 for two months or $99 for twelve months and she wanted to try the Service out.

68.     Plaintiff was injured through the monies paid to Defendant.

69.     Plaintiff seeks to enjoin Defendant's future wrongful conduct.

Violation of False Advertising Law,
Cal. Bus. & Prof. Code §§ 17500 *et seq.*

70.     Cal. Bus. & Prof. Code §§ 17500, *et seq.* prohibits untrue and misleading advertising.

71.     Defendant committed acts of false advertising by representing that customers were signing up for an introductory period/trial and that they could easily cancel the trial.

72.     As a result of Defendant's conduct, Plaintiff and members of the classes were harmed and suffered actual damages as a result of Defendant's FAL violations because:

   a.  they would not have purchased the Service on the same terms if they knew that the Service was not an actual trial that would end at the conclusion of the introductory period with no additional costs incurred or subscription entered into as represented;

   b.  they paid a price premium for the Service based on Defendant's misrepresentations; and

   c.  the Service does not have the characteristics, attributes, features, or benefits as promised.

<u>Violation of the Consumer Legal Remedies Act,</u>
<u>Cal. Civ. Code §§ 1750 *et seq.*</u>

73.    Plaintiff is a "consumer[s]," as defined in Civil Code section 1761(d).

74.    Defendant constitutes a "person" as defined in Civil Code section 1761(c).

75.    The media publication created, marketed, advertised, and sold by Defendant constituted a "service," as defined in Civil Code section 1761(b).

76.    The purchases of the Service by Plaintiff and class members were and are "transactions" within the meaning of Civil Code section 1761(e).

77.    Plaintiff believed the digital access to The Epoch Times she obtained was part of an introductory period/trial and that she could easily cancel.

78.    Defendant's representations and omissions concerning the characteristics, attributes, features, and benefits of the Service were false and/or misleading.

79.    Defendant's false and misleading representations and omissions were designed to, and did, induce the purchase and use of the Service for personal, family, or household purposes by Plaintiff and class members, and violated and continue to violate the following sections of the CLRA:

   a.  In violation of Civil Code § 1770(a)(5), Defendant represented that the subscription had characteristics, attributes, features, and benefits it did not have and could easily be cancelled;

   b.  In violation of Civil Code § 1770(a)(9), Defendant advertised the subscription with an intent not to sell it as advertised; and

   c.  In violation of Civil Code § 1770(a)(16), Defendant represented the subscription as supplied in accordance with its previous representations

of being easy to cancel, when this was false.

80.    Defendant profited from the sale of the falsely, deceptively, and unlawfully advertised Service to unwary consumers.

81.    Defendant's practices caused harm to Plaintiff and to each class member.

82.    Plaintiff will send a CLRA Notice to Defendant concurrently with the filing of this action or shortly thereafter, which details and includes these violations of the CLRA, demand correction of these violations, and provide the opportunity to correct these business practices. Cal. Civ. Code § 1782(a),

83.    If Defendant does not correct these business practices, Plaintiff will amend or seek leave to amend the Complaint to add claims for monetary relief, including restitution and actual damages, under the CLRA.

Violation of the Automatic Renewal Law ("ARL"),
Cal. Bus. & Prof. Code § 17600, <em>et seq.</em>

84.    Defendant did not disclose the automatic renewal offer terms ("AROT") in a clear and conspicuous manner before Plaintiff signed up and paid for the introductory period/trial.

85.    Defendant also failed to present the introductory period/trial terms in a clear and conspicuous manner.

86.    The terms are presented in smaller font that fails to get the customer's attention, compared to the size of the other text on the sign-up webpage.

87.    Defendant failed to obtain Plaintiff's affirmative consent to enroll in the subscription before charging her.

88.    Defendant failed to provide an adequate post-transaction acknowledgement of the parties' obligations.

89.    Defendant failed to provide a way for Plaintiff to cancel her enrollment in the same

way she was unknowingly signed up, through her online account.

90.    Defendant presents a gauntlet of screens when customers seek to cancel, riddled with attempts at preventing them from cancelling by offering lower prices and discounts.

91.    If the customer gets through all of the screens without giving up, Defendant still requires them to call customer service or use the LIVE CHAT function.

92.    Neither of these methods are guaranteed to end the customer's enrollment and continuous charges, as Defendant fails to adequately process the cancellation requests.

Violation of State Consumer Fraud Acts
(Consumer Fraud Multi-State Class)

93.    The Consumer Fraud Acts of the States in the Consumer Fraud Multi-State Class are similar to the consumer protection statutes invoked by Plaintiff and prohibit the use of unfair or deceptive business practices in the conduct of commerce.

94.    The members of the Consumer Fraud Multi-State Class reserve their rights to assert their consumer protection claims under the Consumer Fraud Acts of the States they represent and/or the consumer protection statute invoked by Plaintiff.

95.    Defendant intended that members of the Consumer Fraud Multi-State Class would rely upon its deceptive conduct, which they did, suffering damages.

Fraud

96.    Defendant misrepresented and/or omitted the attributes and qualities of the Subscription, that customers would (1) not be enrolled into autorenewal, (2) be able to cancel as easily as signing up, without having to navigate multiple pages, and (3) not be enticed with additional offers not to cancel.

97.    Defendant's introductory period/trial was designed to obtain customers' credit card information not solely for the introductory period/trial, but to later charge them for autorenewals

11

when they unknowingly failed to cancel subscriptions they were not aware of signing up for.

98.    The records Defendant is required to maintain, and/or the information inconspicuously disclosed to consumers, provided it with actual and constructive knowledge of the falsity and deception of its practices, through statements and omissions.

99.    Defendant knew of the issues described here yet did not address them.

Unjust Enrichment

100.    Defendant obtained benefits and monies because the Service was not as represented and expected, to the detriment and impoverishment of Plaintiff and class members, who seek restitution and disgorgement of inequitably obtained profits.

Jury Demand and Prayer for Relief

Plaintiff demands a jury trial on all issues.

 **WHEREFORE**, Plaintiff prays for judgment:

1. Declaring this a proper class action, certifying Plaintiff as representative and the undersigned as counsel for the class;

2. Injunctive relief to correct the challenged practices;

3. Awarding monetary damages, statutory and/or punitive damages and interest pursuant to statutory and common law claims, except for monetary damages under the CLRA;

4. Awarding costs and expenses, including reasonable fees for Plaintiff's attorneys and experts; and

5. Other and further relief as the Court deems just and proper.

 Dated:    February 9, 2023

Respectfully submitted,

/s/Spencer Sheehan

12

13

Sheehan & Associates, P.C.
60 Cuttermill Rd Ste 412
Great Neck NY 11021
(516) 268-7080
spencer@spencersheehan.com